IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of Prospect Crozer LLC : 
from the Decision of the Board of :
Assessment Appeals of Delaware :
County, PA : Nos. 1596 – 1599 C.D. 2019
: Nos. 1600 – 1629 C.D. 2019
Appeal of: Prospect Crozer LLC : Argued: March 10, 2022


BEFORE: HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE STACY WALLACE, Judge
HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT FILED: September 28, 2022


Prospect Crozer LLC (Taxpayer) appeals 34 orders of the Court of Common Pleas of Delaware County (trial court) that, collectively, assessed Taxpayer's real property at $74 million for tax years 2017, 2018, and 2019.[1] On appeal, Taxpayer argues that the 34 orders are null and void because the judge issued them after he had forfeited his judicial office by assuming a position with the Philadelphia Board of Revision of Taxes (Philadelphia Tax Board). Taxpayer also challenges the orders on their merits because, *inter alia*, the trial court did not state a reason for accepting the valuation of the taxing authority's expert over that of Taxpayer's expert, which was necessary because the trial court accepted the testimony of both experts. For the reasons that follow, we vacate the trial court's orders and remand the matter.

## Background

Taxpayer owns 57.7 acres of land located in Upland Borough, Delaware County, Pennsylvania. Part of this property has been developed with a 6-

---

[1] On May 12, 2020, the Court granted Taxpayer's application to consolidate all 34 appeals.

story hospital known as Crozer Chester Medical Center (Medical Center). The other part of the property has been developed with several buildings and is known as Crozer Theological Seminary (Seminary). For real estate tax purposes, the Medical Center and Seminary properties are assessed as 34 separate parcels. Taxpayer purchased this real property as part of its acquisition of the Crozer-Keystone Health System on July 1, 2016.

For tax years 2017 through 2019, the Delaware County Assessment Office assessed the Medical Center and Seminary properties at a combined value of $80,166,493. Taxpayer appealed the assessment as excessive, and the Delaware County Board of Assessment Appeals denied the appeal. Taxpayer then appealed to the trial court, and the Chester Upland School District (School District) intervened.

At the *de novo* hearing before the trial court, Taxpayer and the School District stipulated that with the admission of the assessments of the Delaware County Assessment Office, the School District established a *prima facie* case.[2] Reproduced Record at 1149a-83a (R.R. __). Taxpayer then submitted expert testimony and documentary evidence to challenge the Delaware County assessments, and the School District responded with its own expert and documentary evidence.

---

[2] In tax assessment appeal proceedings, the taxing authority presents its assessment records into evidence to establish the assessment's presumed validity. *Songer v. Cameron County Board of Assessment Appeal*, 173 A.3d 1253, 1256 (Pa. Cmwlth. 2017). The burden then shifts to the taxpayer to present "sufficient competent, credible and relevant evidence" of the property's fair market value to overcome the assessment's presumed validity. *Id.* at 1257. If the taxpayer meets this burden, the tax assessment record loses its presumed validity. *Green v. Schuylkill County Board of Assessment Appeals*, 772 A.2d 419, 425-26 (Pa. 2001) (citing *Deitch Company v. Board of Property Assessment*, 209 A.2d 397, 402 (Pa. 1965)). If the taxing authority presents rebuttal evidence, the trial court determines the weight to be afforded the conflicting evidence. *Green*, 772 A.2d at 426.

Taxpayer's vice president for development, Frank Saidara, testified that in January 2016, Taxpayer entered into an agreement to purchase the Crozer-Keystone Health System, and the transaction closed on July 1, 2016. The transaction involved numerous real properties owned by Crozer-Keystone Health System. Saidara explained that Taxpayer and Integra Realty Resources – DFW, LLC (Integra Realty) did their "best to come up with a qualified guess" to apportion purchase prices among the properties acquired in order to calculate the real estate transfer taxes. Notes of Testimony (N.T.), 1/14/2019, at 51; R.R. 97a. With respect to the 34 properties here, they estimated a total purchase price of $78 million, which Saidara testified was "high." *Id.*

Taxpayer's real estate appraiser, Ryan Hlubb, prepared an expert report of the fair market value of the Medical Center and Seminary properties, which was submitted into evidence. The Seminary property of 36.2 acres is separated from the Medical Center property of 21.5 acres by Medical Center Boulevard. Hlubb separately valued the Medical Center and Seminary properties because they are not used together.[3]

At the hearing, Hlubb first testified about his valuation of the Seminary property. Hlubb used the sales comparison approach to establish its fair market value.[4] This approach assumes that an informed purchaser will pay no more for a

---

[3] In fact, Taxpayer listed the Seminary property for sale and recently entered an option purchase agreement for $5.35 million.

[4] Fair market value, "while not easily ascertained, is fixed by the opinions of competent witnesses as to what the property is worth on the market at a fair sale." *Grand Prix Harrisburg, LLC v. Dauphin County Board of Assessment Appeals*, 51 A.3d 275, 277 (Pa. Cmwlth. 2012) (quoting *Buhl Foundation v. Board of Property Assessment, Appeals and Review of Allegheny County*, 180 A.2d 900, 902 (Pa. 1962)).

property than the cost of acquiring an existing property with the same utility.[5] Hlubb studied the Seminary property by collecting property tax records, site plans, and interviewing the property owner. He noted that one of the buildings on the Seminary property, Old Main, had been designated a historic building and cannot be demolished. The other buildings had an economic life of five years, which meant that they should be razed or put to another use.

Hlubb identified four comparable vacant land sales in Southeastern Pennsylvania, where the price per acre ranged from $150,000 to $240,000. After adjusting for topography and location, Hlubb concluded that the Seminary property had a value of $165,000 per acre, or $5,971,515, from which he subtracted the cost of razing, i.e., $867,833.[6] Hlubb opined that the Seminary property had a fair market value of $5.1 million for the 2017 and 2018 tax years. Based on updated market data, Hlubb determined that the Seminary property had a value of $5.35 million for tax year 2019.

Next, Hlubb testified about the fair market value of the Medical Center, which is a 21.5-acre property with a 300-bed acute care hospital and parking facilities to accommodate 1,500 cars. The Medical Center is a "special purpose property," meaning it has "a unique physical design, special construction materials,

---

[5] Hlubb did not develop a cost approach because some buildings on the Seminary property dated back to the 1840s. He also did not develop the income capitalization approach because there was no market activity to suggest that the Seminary property could be leased. N.T., 1/14/2019, at 193; R.R. 204a.

[6] To calculate the Seminary property's value, Hlubb multiplied $165,000 by the number of acres of usable land, 36.19 acres, and arrived at $5,971,515. Hlubb Land Valuation Report at 46; R.R. 1507a. From there, he subtracted razing costs, which are the estimated costs for building demolition and site grading. Using $7.50 per square foot as an appropriate unit of cost and multiplying that number by 115,711 square feet for the buildings on the property, Hlubb's estimated razing costs were $867,833. Subtracting $867,833 from $5,971,515 resulted in the value of $5,103,683, which Hlubb rounded to $5.1 million.

or [a] layout that particularly adapts its utility to the use for which it was built." N.T., 2/4/2019, at 174; R.R. 324a. The Medical Center's location in a medical campus zoning district also limits the number of potential buyers.[7]

To calculate the fair market value of the Medical Center property, Hlubb used both a sales comparison and a cost approach. He developed the income capitalization approach but only to test the validity of the other valuation approaches.

For the sales comparison approach, Hlubb identified four sales in the region that were similar to the Medical Center: Memorial Hospital, Suburban Community Hospital, Roxborough Memorial Hospital, and MedStar Southern Maryland Hospital. After making the necessary adjustments to the sales, Hlubb determined that the fair market value of the Medical Center property under the sales comparison approach was $37.5 million for tax years 2017 and 2018 and $39.2 million for tax year 2019.[8]

Hlubb also used the cost approach, which is "based on the concept that an informed investor would not willingly pay more for the subject property than would be necessary to develop an alternative providing economically equivalent benefits." *In re PP&L, Inc.*, 838 A.2d 1, 11 (Pa. Cmwlth. 2003). Hlubb testified that there are two cost methodologies. The reproduction cost method estimates the cost to construct an exact duplicate using the same materials, construction standards, design, layout and quality. The replacement cost method estimates the cost to construct a building of equal utility using modern materials and current design standards. Hlubb used the replacement cost method.

---

[7] The zoning district also allows, by special exception, group daycare homes, daycare centers, parking structures and billboards.

[8] Hlubb explained that the property's fair market value had increased between 2018 and 2019 because of the improved market conditions. N.T., 2/5/2019, at 107; R.R. 446a. For 2018, he set the price per square foot at $55, and for 2019, at $57.50. N.T., 2/5/2019, at 106; R.R. 445a.

Hlubb determined a total replacement cost of $328,592,804 for 2017 and 2018 and $345,419,938 for 2019, to which he added a land value of $4.3 million for each tax year. For 2017 and 2018, he estimated depreciation at $296,061,870, and for 2019 at $309,113,292. Hlubb arrived at a cost valuation of $36.8 million for 2017 and 2018 and $39.6 million for 2019.

Reconciling his sales comparison and cost valuations, Hlubb opined that the fair market value of the Medical Center was $37.5 million for tax years 2017 and 2018 and $39.5 million for tax year 2019. Hlubb opined that the combined fair market value of the Medical Center and Seminary properties was $42.6 million for tax years 2017 and 2018 and $44.5 million for tax year 2019.

In response, the School District introduced the report of its expert real estate appraiser, John J. Coyle, III, and offered his testimony. Coyle stated that the highest and best use for the 57.7-acre property was as a hospital. He did not separate the Medical Center from the Seminary in his valuation. Coyle also used the sales comparison and cost approaches in his valuation.[9]

For the sales comparison approach, Coyle selected three hospital facilities with parking garages. The three properties were part of the Community Health System in Reading, Pennsylvania, which had been sold to Tower Health. Each building ranged from 354,887 square feet to 362,703 square feet and had sale prices ranging from $91.54 per square foot of building area, including the land, to $172.39 per square foot of building area, including the land.

After taking into consideration the differences between those sales and the subject property, Coyle opined that the entire 57.7-acre property should sell at

---

[9] Coyle did not use the income approach, explaining that the income approach examines the economic benefits of property ownership in comparison to the risks of ownership and arrives at a conclusion. For a hospital business, market data was needed, but it was not available.

$105 per square foot of building area, including the land. Multiplying the 703,081 square feet of gross building area of the 57.7-acre property by $105 produced a market value of $73,823,505, which he rounded to $73.8 million.

For the cost approach, Coyle used a reproduction cost method. Coyle testified that the International Association of Assessing Officers defines "reproduction cost new" as "the cost of constructing new property reasonably identical with the given property except for the absence of physical depreciation using the same materials[,] construction standards, design, and quality of workmanship computed on the basis of prevailing prices and on the assumption of normal competency and normal conditions." N.T., 3/20/2019, at 56-57; R.R. 1012a-13a. Coyle explained that reproduction cost does not have to price an exact duplicate building, only one reasonably identical.

To develop the fair market value of the land, Coyle looked at three sales of vacant land. The first involved land in Richland Township, Bucks County, that was purchased by a hospital. The second involved a sale of land along Interstate 80 in Monroe County. The third involved land in Middletown Township, Bucks County, that was purchased by a hospital. Coyle explained that he made an upward adjustment for market conditions and a small downward adjustment for physical features. With these adjustments, the unit sale price ranged from $172,000 to $180,262 per acre. He estimated the market value of the subject land to be $175,000 per acre, which he multiplied by 57.7 acres. This produced a total land value of $10,109,750, which he rounded to $10.1 million.

To estimate the reproduction cost of the Medical Center, Coyle used Taxpayer's building plans to develop a separate price for the foundation, the substructure, the superstructure, the exterior closure for the roofing, and the interior

construction and systems. He separated the mechanical systems into plumbing, heating, ventilating, fire protection and electrical. He then did a separate breakout for the cancer center, the mechanical services building, the front parking garage, and the rear parking garage. Instead of breaking the Seminary buildings into components for evaluation as he did for the Medical Center buildings, Coyle used the same unit cost for each building. Coyle estimated a reproduction cost of $260,891,800 for all the buildings, for both the Seminary and Medical Center properties.[10]

To estimate depreciation, Coyle used two methods: the observed condition breakdown and the aged-life technique. The first method produced a depreciated reproduction cost of $64,367,600. The age-life technique produced a depreciated reproduction cost of $65,222,900. Adding a land value of $10.1 million produced valuations of $74,467,000 and $75,322,900. Reconciling those two numbers, Coyle opined that the real property had a fair market value of $75 million under the reproduction cost approach.

Reconciling his sales comparison estimate of $73.8 million with his reproduction cost estimate of $75 million, Coyle opined that the fair market value of the 57.7-acre property was $74 million for tax years 2017 and 2018 and $73 million for the tax year beginning January 1, 2019.

On cross-examination, Coyle explained that there is a commonsense approach to estimating reproduction costs and a textbook definition. He disagreed that the reproduction cost approach requires an "exact replica of everything [that is] at that property[.]" N.T., 3/18/2019, at 18; R.R. 957a. Coyle offered, for example, that in doing a reproduction cost, he would not use the cost of a new cucumber

---

[10] Coyle testified that the Seminary buildings should be razed because of their age.

marigold tree but, rather, the cost of some reasonable vegetation in its place. N.T., 3/18/2019, at 19; R.R. 958a.

Coyle acknowledged that he did not use a standard reproduction cost approach. Rather, he "blend[ed] the reproduction and replacement cost methods with the intent to reflect [the] cost of reproduction[.]" N.T., 3/18/2019, at 26; R.R. 965a. To do an exact duplicate for a hospital complex, he would have needed about 25,000 drawings. Instead, he used the basic information he was given and his own observations of the property. Coyle clarified that he did not do a replacement cost analysis. He explained that "a replacement cost analysis redesigns the facility and eliminates excess construction costs." N.T., 3/18/2019, at 31; R.R. 970a. For example, the size of a building could be changed or different materials used in a replacement cost analysis.

On October 11, 2019, in a five-page adjudication, the trial court concluded that the fair market value of the Medical Center and Seminary property was $74 million for tax years 2017, 2018 and 2019. The trial court found that both experts agreed that a proper appraisal of the fair market value of the properties used a reconciliation of a sales comparison and cost approach. The trial court made the following findings:

> 8. The court heard testimony from Mr. Coyle whose reconciliation of the sale comparison approach and the cost new approach which resulted in his conclusion that the total fair market value of the subject properties was $74 million for tax years 2017, 2018, and 2019.
>
> 9. The court also accepted the testimony of Mr. Hlubb, on behalf of Prospect, who testified that the value under [the] cost approach (which combined total depreciation as a reduction against total replacement cost (new) of the buildings and then added the land value) resulted in a fair market value of $36.8

9

million for tax years 2017 and 2018 and a fair market value of
$39.6 million for tax year 2019.

10. There did not appear to be any significant externalities
which suggested a change in fair market value during the subject
tax years.

11. The court concluded that the value of $74 million is a valid
and accurate assessment of the fair market value of the
properties.

Trial Court Adjudication at 3-4, Findings of Fact Nos. 8-11; R.R. 3056a-57a.
Taxpayer appealed.

## Appeal

Before this Court,[11] Taxpayer raises four issues. First, Taxpayer has
filed an Application to Vacate Orders on Appeal Because of Structural Error.[12] This
application asserts that the presiding judge, the Honorable John L. Braxton, forfeited
his judicial office by taking a position with the Philadelphia Tax Board and, thus,
lacked authority to issue the 34 orders on appeal here. Second, Taxpayer argues that
the trial court did not make adequate findings of fact or explain how it determined
the fair market value of Taxpayer's property after accepting the testimony of both
experts. Third, Taxpayer argues that the trial court erred by accepting the
methodology of the School District's expert, which used a reproduction cost analysis
that is flawed and has no support in the real estate appraisal profession. Fourth,

[11] Our review in tax assessment matters determines whether the trial court abused its discretion,
committed an error of law, or reached a decision not supported by substantial evidence. *Douglass
Village Residents Group v. Berks County Board of Assessment Appeals*, 84 A.3d 407, 408 n.3 (Pa.
Cmwlth. 2014). Our standard of review for questions of law is *de novo*, and our scope of review
is plenary. *Id*.

[12] Taxpayer filed its application to vacate on March 6, 2020, and the Court referred the application
to the merits panel.

Taxpayer argues that the trial court erred by allowing the report of Integra Realty to be used to cross-examine Taxpayer's witnesses.

Article V, Section 17(a) of the Pennsylvania Constitution prohibits a judge from holding "an office or position of profit in the government of the United States, the Commonwealth or any municipal corporation or political subdivision thereof[.]" PA. CONST. art. V, §17(a). In its application to vacate, Taxpayer asserted that Senior Judge Braxton held a "position of profit" with the Philadelphia Tax Board at the same time he served as a judge on the instant tax appeals, which rendered his 34 orders null and void. The School District responded that Taxpayer's application to vacate was untimely filed and, further, that the Pennsylvania Supreme Court approved Senior Judge Braxton's completion of this judicial assignment after his appointment to the Philadelphia Tax Board

Taxpayer supported its application to vacate with affidavits and public record searches that it attached thereto. Following argument before the merits panel, the Court concluded that a record was needed on Taxpayer's assertion of incompatible service and the School District's response thereto. Accordingly, the Court entered an order remanding this matter to the trial court with directions to develop an evidentiary record on the following factual questions:

> (1) The date on which Senior Judge Braxton assumed his position on the Philadelphia Board of Revision of Taxes and began receiving compensation therefor;
>
> (2) Whether Senior Judge Braxton's continued work on the above-captioned assessment appeals of Prospect Crozer, LLC while simultaneously serving on the Philadelphia Board of Revision of Taxes was approved in writing or in some other way by the Pennsylvania Supreme Court; and
>
> (3) The date on which Prospect Crozer, LLC learned that when Senior Judge Braxton issued the orders in the above-captioned

appeals, he had already assumed his position with the Philadelphia Board of Revision of Taxes.

Court Order, 3/17/2022.

## Remand Hearing

On April 20, 2022, the trial court conducted a hearing.[13] The record consists of a stipulation of the parties; Taxpayer's public record searches and affidavits; and the testimony of Senior Judge Braxton.

Taxpayer's affidavits related to how it learned of Senior Judge Braxton's dual service. Leslie Gerstein, an attorney at the firm of Klehr, Harrison, Harvey, Branzburg, LLP, attested that she observed Senior Judge Braxton participating in hearings of the Philadelphia Tax Board in late Fall of 2019. Luke McLoughlin, an attorney at the firm Duane Morris, LLP, attested that on or about December 18, 2019, he attended a hearing at the Philadelphia Tax Board where he observed a nameplate for Senior Judge Braxton. In February 2020, McLoughlin learned from the City of Philadelphia Law Department that Senior Judge Braxton was elected to the Philadelphia Tax Board on May 16, 2019. McLoughlin then submitted a Right-to-Know Law[14] request for information on the date of Senior Judge Braxton's first paycheck for his service on the Philadelphia Tax Board;

---

[13] The remand hearing related to applications to vacate filed by Taxpayer in the following consolidated appeals: *In re: Appeal of Prospect Crozer LLC from the Decision of the Board of Assessment Appeals of Delaware County, PA* (Pa. Cmwlth., Nos. 1596-1629 C.D. 2019, filed September 28, 2022); *In Re: Appeal of Prospect Crozer LLC Tax Assessment Appeals* (Pa. Cmwlth., Nos. 1630-1633 C.D. 2019, filed September 28, 2022); *In Re: Appeal of Prospect Crozer LLC from the Decision of the Board of Assessment Appeals of Delaware County, PA* (Pa. Cmwlth., Nos. 1727-1728 C.D. 2019, filed September 28, 2022); and *Chester-Upland School District v. Chester City Board of Revision of Taxes and Appeals* (Pa. Cmwlth., Nos. 386-387 C.D. 2020, filed September 28, 2022). Participating in the remand hearing were multiple taxing authorities: Chester Upland School District, Springfield School District, Springfield Township, and the City of Chester. The County of Delaware also appeared at the hearing.

[14] Act of February 14, 2008, P.L. 6, 65 P.S. §§67.101-67.3104.

McLoughlin received that information on June 5, 2020. Alan Kessler, also an attorney with Duane Morris, LLP, attested that in January 2020, he tasked the firm's librarian with determining when Senior Judge Braxton began serving on the Philadelphia Tax Board, but the librarian was unsuccessful. Kessler also attested that in January 2020, he learned from Gerstein that she had seen Senior Judge Braxton participating in a hearing before the Philadelphia Tax Board in the Fall of 2019.

Taxpayer also submitted a record certification from Geoff Moulton, the Court Administrator of Pennsylvania, dated March 20, 2020. That certification stated as follows:

> After an examination by the Administrative Office of Pennsylvania Courts ("AOPC") of its records pertaining to the time period from 2017 through 2020, as well as an examination of the records of the Prothonotary of the Supreme Court of Pennsylvania, I hereby certify there is no record of entry of an order, decision, or other determination of the Supreme Court of Pennsylvania, the Chief Justice, or any other justice, or AOPC approving simultaneous service, by the Honorable John L. Braxton on the Philadelphia Board of Revision of Taxes and as a senior judge within Pennsylvania's Unified Judicial System. Any such record or entry would be in my custody as Court Administrator of Pennsylvania.

N.T., 4/20/2022, at 29, Exhibit C-7.

The School District offered the testimony of Senior Judge Braxton. He testified that in or around June 2017, he was assigned the instant tax matter and all related tax appeals. He stated that he was elected to the Philadelphia Tax Board on May 16, 2019.

13

On June 24, 2019, while he was presiding over another one of Taxpayer's related tax appeals,[15] Senior Judge Braxton informed the parties that he was retiring from judicial service because he "had been elected by the Board of Judges of Philadelphia County" to the Philadelphia Tax Board. N.T., 4/20/2022, at 63. Senior Judge Braxton testified that he did not know "the actual date" that he began sitting on the Philadelphia Tax Board, explaining that he had to go through orientation before hearing cases. *Id.* Senior Judge Braxton agreed that he received his first compensation for his position with the Philadelphia Tax Board on June 16, 2019. Acknowledging that he did not discuss his compensation with the parties on June 24, 2019, Senior Judge Braxton explained that by telling the parties of his appointment, he was telling them that he was "being paid." *Id.* at 84.

Senior Judge Braxton testified that he advised Joe Mittleman, Director of Judicial District Operations for the AOPC, that he had been appointed to the Philadelphia Tax Board and talked about "whether or not [he] should finish things or just walk away." N.T., 4/20/2022, at 65, 68. Senior Judge Braxton retired from judicial service on January 24, 2020.

On May 4, 2022, the trial court issued a report on the factual questions set forth in this Court's March 17, 2022, order.

Regarding the date on which Senior Judge Braxton assumed his position on the Philadelphia Tax Board and began receiving compensation therefor, the trial court summarized the evidence as follows. Both the testimony of Senior Judge Braxton and the Declaration of the Director of Human Resources for the City of Philadelphia established the date of Senior Judge Braxton's appointment to the

---

[15] *See Chester-Upland School District v. Chester City Board of Revision of Taxes and Appeals* (Pa. Cmwlth., Nos. 386-387 C.D. 2020, filed September 28, 2022).

Philadelphia Tax Board as May 19, 2019. The parties stipulated that Senior Judge Braxton received his first paycheck from the Philadelphia Tax Board on June 16, 2019. The trial court credited Senior Judge Braxton's testimony that he began hearing cases as a member of the Philadelphia Tax Board sometime in the Fall of 2019 but did not remember the exact date because he had to undergo orientation before hearing cases.

Regarding the question of whether Senior Judge Braxton's work on Taxpayer's assessment appeals, while simultaneously serving on the Philadelphia Tax Board, had been approved by the Pennsylvania Supreme Court, the trial court summarized the evidence as follows. A March 2020 record certification from Geoff Moulton, the Court Administrator of Pennsylvania, stated that "there is no record or entry of an order, decision, or other determination of the Supreme Court of Pennsylvania, the Chief Justice or any other Justice, or AOPC approving simultaneous service, by [Senior Judge Braxton], on the [Philadelphia Tax Board] and as a senior judge within Pennsylvania's Unified Judicial System." Trial Court Op., 5/4/2022, at 4, Finding of Fact No. 7.b. Senior Judge Braxton submitted his resignation as a senior judge in late 2019 and officially ended his judicial service on January 24, 2020. The trial court credited Senior Judge Braxton's testimony that he informed Mittleman of his election to the Philadelphia Tax Board; the complex nature of his judicial assignments; that he could finish up those cases or walk away; and that Mittleman told him to finish his judicial assignments. Senior Judge Braxton's communications with the AOPC were oral not written.

Regarding the date that Taxpayer learned that Senior Judge Braxton adjudicated its assessment appeals after assuming his position on the Philadelphia Tax Board, the trial court summarized the evidence as follows. On June 24, 2019,

15

Senior Judge Braxton informed counsel for the parties that he was "going to be sitting in Philadelphia as a member of the Board of Revision of Taxes[.]" *Id.* at 6, Finding of Fact No. 8.c. Senior Judge Braxton advised the parties that "as soon as I leave here, I'm going to do that other post. And that's why I can't linger here. I have to get this matter done. And the AOPC, the Supreme Court wants me to just finish this and then I will go on to my next assignment . . . . I'm going to be sitting in Philadelphia as a member of the Board of Revision of Taxes over there." *Id.* at 6, Finding of Fact No. 8.d. The affidavits from Gerstein, McLoughlin, and Kessler, as well as the email exchange between McLoughlin and the Philadelphia City Law Department, demonstrated that Senior Judge Braxton began hearing cases for the Philadelphia Tax Board in the Fall of 2019. *Id.* at 6, Finding of Fact No. 8.b.

The trial court credited Senior Judge Braxton's testimony that he timely notified representatives of the AOPC of his appointment to the Philadelphia Tax Board and received approval to complete his outstanding judicial assignments. Trial Court Op., 5/4/2022, at 7, Finding of Fact No. 10.

On or about May 4, 2022, Taxpayer submitted supplemental findings of fact to the trial court to address new evidence. Specifically, it sought to admit into evidence an email exchange with the AOPC (Exhibit C-19) and a copy of an affidavit from Mittleman (Exhibit C-20), which refuted Senior Judge Braxton's characterization of their conversations.[16] Taxpayer explained that neither was available at the time of the April 20, 2022, evidentiary hearing. In response, the School District moved to strike and preclude Taxpayer's submissions.

---

[16] As part of his duties as Director of Judicial District Operations, Mittleman facilitated the assignment of senior judges to local districts. Mittleman Affidavit, ¶¶1-2.

16

By order dated May 4, 2022, the trial court granted the School District's motion as to Exhibit C-19. It did so for the stated reason the record was closed at the end of the hearing on April 20, 2022, and Taxpayer had not requested to keep the record open for an affidavit from Mittleman. Trial Court Order, 5/4/2022, at 2.

On May 5, 2022, Taxpayer sought reconsideration, explaining that the Mittleman affidavit only became available on May 4, 2022. Further, the trial court's order striking Exhibit C-19 did not refer to Exhibit C-20.

On May 18, 2022, the trial court denied reconsideration. It clarified its order of May 4, 2022, and struck both Exhibits C-19 and C-20, for the stated reason that the record closed on April 20, 2022. Accordingly, the trial court refused to supplement the record with after-discovered evidence.

Following the transmittal of the trial court's order to this Court, the parties filed supplemental briefs.

## Analysis
## I. Senior Judge Braxton's Incompatible Service on the Philadelphia Tax Board

Taxpayer asserts that Senior Judge Braxton was precluded from serving simultaneously as a senior judge and a member of the Philadelphia Tax Board. Article V, Section 17(a) of the Pennsylvania Constitution prohibits a judge from holding another "position of profit" with any Federal, State or municipal body. Taxpayer contends that as of June 16, 2019, when Senior Judge Braxton began receiving compensation for his position on the Philadelphia Tax Board, he forfeited his authority to serve as a judge in Taxpayer's tax appeals. His issuance of the 34 orders on October 11, 2019, constituted a structural error, which requires those orders to be vacated and the tax appeals remanded for a decision by another judge.

The School District responds that Taxpayer waived this challenge to the 34 orders because it knew of this alleged structural error on June 24, 2019, when Senior Judge Braxton informed the parties of his appointment to the Philadelphia Tax Board. However, Taxpayer waited until March of 2020 to file its application to vacate. Taxpayer's failure to seek Senior Judge Braxton's disqualification at the earliest opportunity precludes it from raising the issue at the appellate stage of the proceeding. Alternatively, the School District argues that Senior Judge Braxton was directed to complete his judicial *per diem* assignment notwithstanding his appointment to the Philadelphia Tax Board.

A structural error is "a constitutional violation affecting the 'framework within which the trial proceeds, rather than simply an error in the trial process itself[.]'" *Commonwealth v. Baroni*, 827 A.2d 419, 420 (Pa. 2003) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). Structural errors "infect the entire trial process." *Interest of J.M.G.*, 229 A.3d 571, 587 (Pa. 2020) (Todd, J., concurring) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993)). Structural errors are unlike "'trial error,' because trial errors may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.'" *Interest of J.M.G.*, 229 A.3d at 586-87 (Todd, J., concurring) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006)).[17] Courts address structural errors primarily in criminal cases, but structural errors may also taint a civil case. *Interest of J.M.G.*, 229 A.3d at 587 n.2 (Todd, J., concurring) (citing *Bruckshaw v. Frankford Hospital of City of Philadelphia*, 58 A.3d 102, 113-14 and n.6 (Pa. 2012) (court officer's removal of presumptively

---

[17] For trial errors, a reviewing court "'can make an intelligent judgment' about whether the error might have affected the fact-finder." *Interest of J.M.G.*, 229 A.3d at 587 (Todd, J., concurring) (quoting *Satterwhite v. Texas*, 486 U.S. 249, 258 (1988)).

18

competent juror without notice to the court or the parties was error for which prejudice was presumed, "suggestive" of structural error)).

The Pennsylvania Constitution prohibits a federal office holder from holding state office, and it authorizes the General Assembly to identify other incompatible offices. Article VI, Section 2 states:

> No member of Congress from this State, nor any person holding or exercising any office or appointment of trust or profit under the United States, shall at the same time hold or exercise any office in this State to which a salary, fees or perquisites shall be attached. The General Assembly may by law declare what offices are incompatible.

PA. CONST. art. VI, §2. Pursuant to Article VI, Section 2, the General Assembly has declared, for example, that one cannot simultaneously hold the office of magisterial district judge and the office of prothonotary or clerk of court. Section 4 of the Act of May 15, 1874, P.L. 186, 65 P.S. §4. *See also Commonwealth ex rel. Fox v. Swing*, 186 A.2d 24, 25 (Pa. 1962).

Regarding judges, the Pennsylvania Constitution was amended in 1968 to specify positions incompatible with a judicial office. Article V, Section 17 of the Pennsylvania Constitution states, in relevant part, as follows:

> (a) Justices and *judges* shall devote full time to their judicial duties, and *shall not* engage in the practice of law, hold office in a political party or political organization, or *hold an office or position of profit in the government of the United States, the Commonwealth or any municipal corporation or political subdivision thereof*, except in the armed service of the United States or the Commonwealth.
>
> (b) Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court. Justices of the peace shall be governed by rules or canons which shall be prescribed by the Supreme Court.

19

PA. CONST. art. V, §17(a)-(b) (emphasis added).  Article V, Section 17 illustrates "a special constitutional intention to maintain the purity of the bench" by singling "out the judiciary for pointed instructions on judicial comportment."  PENNSYLVANIA CONSTITUTIONAL CONVENTION 1967-68, REFERENCE MANUAL NO. 5, Part IV, §3, at 148 (1968).  Our Supreme Court has explained that Article V, Section 17(a) prohibits a Pennsylvania judge from simultaneously serving as a federal court judge.  *Simmons v. Tucker*, 281 A.2d 902, 904 (Pa. 1971).  It is not a matter of discretion for the Pennsylvania judge.

In *Simmons*, the Honorable Barron P. McCune, a judge of the Court of Common Pleas of Washington County, was nominated to the position of United States District Judge for the Western District of Pennsylvania.  His appointment was confirmed by the United States Senate on December 16, 1970, and his commission was issued on December 18, 1970.  On December 28, 1970, Judge McCune resigned from state judicial service, effective January 4, 1971.  A question was raised about the date the vacancy occurred for purposes of electing his replacement.  A would-be candidate claimed that the vacancy occurred on December 18, 1970, when Judge McCune received his commission as a federal judge.  The Pennsylvania Supreme Court disagreed.  Noting that one does not hold office as a federal judge until the oath of office is administered, the Supreme Court concluded that there was no incompatibility because Judge McCune resigned 18 days before his federal office began on January 22, 1971.  Nevertheless, the Supreme Court agreed that under Article V, Section 17(a), "the offices of Common Pleas judge and federal district judge are incompatible."  *Simmons*, 281 A.2d at 904.

An "office of profit" is one that pays compensation to the office holder.  The office of "recorder for the Mayor's Court" was held to be an "office of profit"

that a judge could not hold. *Commonwealth v. Conyngham*, 65 Pa. 76, 83-84 (1870). The Philadelphia Tax Board is a municipal corporation or political subdivision of the Commonwealth, and a member of the Philadelphia Tax Board receives an annual salary of $70,000. THE PHILADELPHIA CODE §20-304(7) (2020). A member of the Philadelphia Tax Board holds a "position of profit." PA. CONST. art. V, §17(a). In sum, the offices of a "common pleas judge" and member of the Philadelphia Tax Board are "incompatible." *Simmons*, 281 A.2d at 904; *Conyngham*, 65 Pa. at 84.

Further, the "applicable rule, which is generally held in all American jurisdictions, holds that where a single person holds two incompatible offices, the acceptance of the second *ipso facto* vacates the first." *Fauci v. Lee*, 38 Misc. 2d 564, 567 (N.Y. Sup. Ct. 1963); *see also Commonwealth ex rel. Crow v. Smith*, 23 A.2d 440, 442 n.3 (Pa. 1942) (stating that an official holding two incompatible offices is required to abandon one of them); *DeTurk v. Commonwealth*, 129 Pa. 151, 160 (1889) (noting common law rule that where incompatible offices are derived from common source, acceptance of the second automatically vacates the first); *Opinion of the Justices*, 647 A.2d 1104, 1105 (Del. 1994); *Stubbs v. Lee*, 64 Me. 195, 198 (1874); *Scott v. Strobach*, 49 Ala. 477, 485 (1873).

It was structural error for Senior Judge Braxton to issue the adjudications on Taxpayer's appeals while he also served on the Philadelphia Tax Board. This structural error cannot be waived implicitly or explicitly, or by agreement of the parties. It is not unlike the well-established principle that parties cannot agree to confer subject matter jurisdiction on a tribunal where it does not exist. *Greenberger v. Pennsylvania Insurance Department*, 39 A.3d 625, 629 n.5 (Pa. Cmwlth. 2012). A judge that violates Article V, Section 17(a) of the Pennsylvania Constitution forfeits his judicial office.

21

Litigants have a right to have decisions made by a judge validly holding his office. A trial conducted by a judge that lacks capacity is tainted by structural error which cannot be waived. *See generally Commonwealth v. Martin*, 5 A.3d 177, 218-19 (Pa. 2010) (Saylor, J., concurring);[18] *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (failure to appoint an attorney to represent child's legal interests constituted a structural error that was non-waivable).

That a judge's incompatible service may also implicate the Code of Judicial Conduct does not mean this Court cannot consider how a judge's incompatible service affects the constitutionality of a trial. As our Supreme Court has explained, courts have a "solemn obligation to protect, safeguard and uphold [constitutional] rights." *Commonwealth v. Koehler*, 229 A.3d 915, 936 (Pa. 2020). This Court is required to examine the limits imposed by any constitutional provision, and if there is a violation, grant appropriate relief.

The School District argues that Article V, Section 17(a) applies only to commissioned judges and justices, not to senior judges. It notes that Article V, Section 17(a) requires judges to work "full time," but senior judges work part-time.

---

[18] Justice Saylor observed that there is a split of authority among jurisdictions about whether a structural error can be waived. *Compare Mains v. Commonwealth*, 739 N.E.2d 1125, 1128 n.3 (Mass. 2000) ("Our cases have held that even structural error is subject to the doctrine of waiver."), *with State v. Aragon*, 210 P.3d 1259, 1262 (Ariz. 2009) (declining to apply waiver principles to structural error). Justice Saylor explained that

> [o]n the one hand, structural error, by definition, impacts the basic integrity of the trial, which must be assured to maintain public confidence in the criminal justice system. On the other hand, there is the possibility, if all structural errors are treated as non-waivable, for the defense to omit an objection to assure a reversal on appeal in the absence of an acquittal.

*Martin*, 5 A.3d at 218 (Saylor, J., concurring) (quoting *Reid v. State*, 690 S.E.2d 177, 181 (Ga. 2010) (reflecting the position that structural error is waivable)). In his concurrence, Justice Saylor favored a fact-based assessment of the particular structural error to decide whether the error was waivable.

22

Further, magistrate judges are permitted to have a law practice and other employment.[19] To support its assertion that senior judges are exempt from the prohibition on dual service, the School District directs the Court to *In re Cain*, 590 A.2d 291 (Pa. 1991).

In *In re Cain*, a senior judge was convicted of a violation of the Hobbs Act, 18 U.S.C. §1951. The Judicial Inquiry and Review Board filed a petition to remove the senior judge because his conviction rendered him ineligible to serve. The question was whether the mandate that a convicted judge be removed applied to senior judges. *Former* Article V, Section 18(*l*) of the Pennsylvania Constitution stated:

> A justice, judge or justice of the peace convicted of misbehavior in office by a court, disbarred as a member of the bar of the Supreme Court or removed under this section eighteen *shall forfeit automatically his judicial office* and thereafter be ineligible for judicial office.

*Former* PA. CONST. art. V, §18(*l*) (emphasis added). The Supreme Court explained that "judicial office" referred to the duties of a "justice, judge or justice of the peace," which are performed by senior judges. *In re Cain*, 590 A.2d at 292. Accordingly, the senior judge's conviction automatically rendered him ineligible for judicial office.

The School District contends that had "justice" and "judge" included senior judges within the ambit of *former* Section 18(*l*), then the Supreme Court

---

[19] In *In re Murphy*, 10 A.3d 932, 938 (Ct. Jud. Disc. 2010), the Court of Judicial Discipline of Pennsylvania explained that in Article V, Section 17(b) of the Pennsylvania Constitution, "justices and judges" are treated separately from "justices of the peace." PA. CONST. art. V, §17(b) ("Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court. Justices of the peace shall be governed by rules or canons which shall be prescribed by the Supreme Court.").

would not have had to consider whether the term "judicial office" included the work of a senior judge, as it did in *In re Cain*. It notes that Article V, Section 17(a) does not expressly refer to "senior judges," and it does not use the phrase "judicial office."

When construing the Constitution, "[o]ur ultimate touchstone is the actual language of the Constitution itself." *Jubelirer v. Rendell*, 953 A.2d 514, 528 (Pa. 2008) (citing *Stilp v. Commonwealth*, 905 A.2d 918, 939 (Pa. 2006)). Further, "because the Constitution is an integrated whole, effect must be given to all of its provisions whenever possible." *Jubelirer*, 953 A.2d at 528 (citing *Cavanaugh v. Davis*, 440 A.2d 1380, 1382 (Pa. 1982)). Article V, Section 17(a) applies to "judicial duties," and senior judges assume judicial duties. *In re Cain* established that it is the work performed, not the appellation that is determinative. Following that logic, we conclude that Article V, Section 17(a) applies to senior judges. Further, had the proscription against incompatible service not applied to senior judges, that exemption would have been provided in Section 17(b), as it was for magistrate judges. Because senior judges perform "judicial duties," they are subject to Article V, Section 17(a).

The School District argues that the AOPC authorized Senior Judge Braxton to complete his outstanding judicial assignments while simultaneously serving on the Philadelphia Tax Board. Taxpayer responds that Senior Judge Braxton's testimony about Mittleman's out-of-court statements were hearsay. Indeed, Taxpayer's hearsay objection was sustained by the trial court, which instructed Senior Judge Braxton "not to testify as to what any third party told him." N.T., 4/20/2022, at 67. Contrary to its own ruling, the trial court then used those hearsay statements to find that Mittleman "authorized" Senior Judge Braxton "to complete his conflict cases[ and] the present matters[.]" Trial Court Op., 5/4/2022,

24

at 5, Findings of Fact No. 7.i. The School District responds that Mittleman's statements to Senior Judge Braxton were properly considered because they constituted verbal acts, *i.e.*, the AOPC orally authorized his continued judicial service after assuming his position with the Philadelphia Tax Board by a verbal act.

"[A] 'verbal act' is a statement which creates legal rights, duties or responsibilities offered for their legal significance alone." *Municipality of Bethel Park v. Workmen's Compensation Appeal Board (Hillman)*, 636 A.2d 1254, 1256 n.2 (Pa. Cmwlth. 1994). The statements are not offered to establish the truth of the matter asserted but, rather, for some other relevant purpose.[20]

We reject the School District's argument for several reasons. First, the question was whether the Supreme Court, or one of its justices, had directed Senior Judge Braxton to serve as a senior judge notwithstanding the inception of his service on the Philadelphia Tax Board. Second, the School District did not establish that Mittleman, an employee of the AOPC, had authority to approve service on the Philadelphia Tax Board by a senior judge. Without that foundation, Mittleman's so-

---

[20] Treatise authority describes "verbal acts" as follows:

> Oral or written expressions of offer and acceptance, or the exchange of promises that create a contract are examples. The dispositive provisions of a will are verbal acts, although statements of fact in a will may be hearsay. Statements made by the parties to a conspiracy in forming that conspiracy are verbal acts. Statements made in an attempt to corrupt a juror or intimidate a witness are verbal acts. A statement giving notice is a verbal act, and in a case in which it is relevant whether a party had received notice, evidence of the statement containing the notice is not hearsay. Instructions may be verbal acts.
>
> The term "verbal act" also applies to statements that accompany conduct and explain the intent of that conduct.

Leonard Packel & Anne Bowen Poulin, *Nonhearsay – Statements Offered as Verbal Acts*, 1 WEST'S PA. PRAC., EVIDENCE §801-2 (4th ed. 2021) (footnote omitted).

25

called verbal acts are irrelevant. In any case, the AOPC cannot waive the Pennsylvania Constitution.

The School District next argues that the Supreme Court's Rules of Judicial Administration regulate senior judges, and those rules do not bar a senior judge from extra-judicial employment. Taxpayer responds that the Rules of Judicial Administration cannot trump the Constitution. *See* PA. CONST. art. V, §10(c) (authorizing Supreme Court to prescribe general rules of practice, procedure and administration that are consistent with the Constitution). We agree. The Rules of Judicial Administration must be read in conjunction with the express constitutional prohibition against judges "hold[ing] an office or position of profit in the government of the United States, the Commonwealth or any municipal corporation or political subdivision thereof[.]" PA. CONST. art. V, §17(a).[21]

Finally, the School District argues that Taxpayer has waived its constitutional challenge to the tax proceeding because it did not move to disqualify Senior Judge Braxton until after it received an unfavorable result on its tax appeals. *Reilly v. Southeastern Pennsylvania Transportation Authority*, 489 A.2d 1291, 1300 (Pa. 1985). The School District argues that the recusal of a jurist must be sought "when the party knows of the facts that form the basis for the motion to recuse," *Lomas v. Kravitz*, 170 A.3d 380, 390 (Pa. 2017), and facts that "should have been

---

[21] Taxpayer also argues that Senior Judge Braxton's position with the Philadelphia Tax Board was incompatible with his temporary assignment to the trial court to adjudicate tax assessment appeals and cites to Canon 3.1 of the Pennsylvania Code of Judicial Conduct, CODE OF JUDICIAL CONDUCT CANON 3.1 (requiring judges to regulate their extrajudicial activities to minimize risk of conflict with their judicial activities). The Code of Judicial Conduct, however, is not "intended to be the basis for litigants to seek collateral remedies against each other or to obtain tactical advantages in proceedings before a court." CODE OF JUDICIAL CONDUCT, Preamble (7). Should a judge violate the standards of conduct, that is a matter for the Pennsylvania Supreme Court to address pursuant to Article V, Section 10(a) of the Pennsylvania Constitution, PA. CONST. art. V, §10(a) (relating to exercise of general supervisory and administrative authority over all courts).

26

known" are to be considered in determining timeliness. *Goodheart v. Casey*, 565 A.2d 757, 764 (Pa. 1989). Where the disqualification is requested after judgment is entered, then it must be shown that the facts could not have been presented earlier "in the exercise of due diligence." *Reilly*, 489 A.2d at 1301.

Here, Taxpayer acknowledges that it learned of Senior Judge Braxton's appointment to the Philadelphia Tax Board on June 24, 2019, when Senior Judge Braxton stated:

> The good Judges of the City of Philadelphia have elected me to another post to which I'm going to leave – *as soon as I leave here, I'm going to do that other post*. And that's why I can't linger here. I have to get this matter done. And the AOPC, the Supreme Court wants me to finish this and then I will go on to my next assignment, which will be something that probably Mr. Kessler is well familiar with. *I'm going to be sitting in Philadelphia as a member of the Board of Revision of Taxes over there*.

Taxpayer Application to Vacate Orders, Exhibit H; N.T., 6/24/2019, at 219 (emphasis added). Taxpayer reasons that there is a difference between an appointment to an incompatible position and service thereon, as the Supreme Court explained in *Simmons*, 281 A.2d. 902. We agree. Senior Judge Braxton did not state that his duties for the Philadelphia Tax Board would overlap with his duties as a member of the judiciary. To the contrary, his statement implied that he would complete his judicial duties before he began his service on the Philadelphia Tax Board.

The affidavits showed that Taxpayer learned through counsel that Senior Judge Braxton's nameplate appeared in the Philadelphia Tax Board's hearing room on December 18, 2019. In late January 2020, Taxpayer's counsel learned that Senior Judge Braxton was observed hearing cases on the Philadelphia Tax Board in

the Fall of 2019. In February of 2020, Taxpayer's counsel learned that Senior Judge Braxton had been elected to the Philadelphia Tax Board on or about May 16, 2019, but could not confirm when Senior Judge Braxton began his service or started to receive compensation. On June 5, 2020, in response to a Right-to-Know request, Taxpayer's counsel learned that Senior Judge Braxton began receiving compensation for his service on the Philadelphia Tax Board as of June 16, 2019.

In *Lomas*, 170 A.3d at 390, the developer's recusal motion, filed one month after the relevant facts had been disclosed, was rejected as untimely filed. Here, Taxpayer did not begin to learn of simultaneous service until December 2019, and did not receive firm confirmation of Senior Judge Braxton's compensation for service with the Philadelphia Tax Board until June 5, 2020.

Taxpayer exercised due diligence. It learned in December of 2019 that Senior Judge Braxton may have started his position at the Philadelphia Tax Board before completing his judicial assignments on Taxpayer's tax appeals. Taxpayer then took prompt and reasonable steps to ascertain the facts before filing an application to vacate in March of 2020. Given this history, we reject the School District's contention that Taxpayer's application to vacate was untimely filed. The facts had to be determined before appropriate relief could be sought.

More to the point, *Reilly* and *Lomas* govern motions to disqualify, but Taxpayer did not file a motion to disqualify Senior Judge Braxton. Rather, it filed an application to vacate the 34 orders that are the subject of this appeal on the basis that the entire proceeding was unconstitutional. The presiding judge forfeited his judicial office by June 16, 2019, when he assumed a "position of profit" with the Philadelphia Tax Board. The 34 orders that are the subject of this appeal were issued on October 19, 2019, and, thus, are null and void.

28

We reject the School District's waiver argument. Taxpayer filed an application to vacate 34 orders on grounds that they were null and void; it did not file a motion to recuse.[22] In any case, Taxpayer acted with due diligence to investigate if and when Senior Judge Braxton began to work for the Philadelphia Tax Board and thereby forfeited his judicial office.

Senior Judge Braxton forfeited his judicial office no later than June 16, 2019, when he began to receive compensation in his "position of profit" on the Philadelphia Tax Board. PA. CONST. art. V, §17(a). The 34 orders he issued in this case are nullities because they were issued after he forfeited his judicial office. Accordingly, we grant Taxpayer's application and vacate the trial court's orders.

## II. Assessment Adjudications

Taxpayer argues that the trial court erred by omitting an explanation of the reasons for its decision. In tax assessment appeals, the trial court weighs the testimony and valuations provided by the experts and arrives at a valuation based on the credibility assigned to their opinions. Here, the trial court deemed both experts credible but relied entirely on Coyle's valuation without explanation. Taxpayer contends that the trial court's adjudications are inadequate as a matter of law.

The School District responds that Taxpayer simply challenges the weight assigned to each expert's opinion by the trial court. The School District acknowledges that the trial court was required to give reasons for its decision. *See Westinghouse Electric Corporation v. Board of Property Assessment, Appeals and Review of Allegheny County*, 652 A.2d 1306, 1312 (Pa. 1995) (stating that "[i]n

---

[22] In *Lomas*, the developer's recusal motion, filed one month after the relevant facts had been disclosed, was rejected as untimely filed. Here, the facts were not finally confirmed until June 5, 2020, after the application to vacate was filed on the basis of information received from public and private sources.

making a determination in a tax assessment appeal, the trial court must state the basis and reasons for its decision"). However, the School District argues that the trial court's adoption of Coyle's opinion of fair market value constitutes the explanation.

In a tax assessment appeal, the trial court hears the matter *de novo* and is the finder of fact. *Grand Prix Harrisburg*, 51 A.3d at 280. As such, the trial court has exclusive province over all matters of credibility and evidentiary weight. Additionally, the trial court has the discretion to choose which valuation method to use to value a particular property. *Id*. The trial court's findings will not be disturbed if they are supported by substantial evidence in the record. *Herzog v. McKean County Board of Assessment Appeals*, 14 A.3d 193, 200 (Pa. Cmwlth. 2011). Nevertheless, "the trial court must state the basis and reasons for its decision." *Green*, 772 A.2d at 433 (quoting *Westinghouse Electric Corporation*, 652 A.2d at 1312). Additionally, if an appraiser uses an invalid methodology, his opinion is not competent and cannot support a valuation. *Grand Prix Harrisburg*, 51 A.3d at 280.

Here, the trial court found that both experts agreed that the proper way to value the Medical Center and Seminary properties was by a replacement cost method. It stated that "[w]hile [the experts] differed in some details, both experts agreed that a proper appraisal of the fair market value of the properties entailed an evaluation through a cost of replacement analysis." Trial Court Adjudication, 10/11/2019, Finding of Fact No. 7; R.R. 3056a. This is inaccurate. Coyle used reproduction cost, not replacement cost, to value the Medical Center and Seminary properties. Further, Taxpayer challenges Coyle's reproduction cost approach as *sui generis* and without support in the appraisal profession.

The trial court accepted Coyle's testimony that the fair market value of Taxpayer's real property was $74 million for the 2017 and 2018 tax years, and $73

million for the 2019 tax year.  The trial court also accepted Hlubb's testimony that this property's "fair market value was $36.8 million for tax years 2017 and 2018 and . . . $39.6 million for tax year 2019."  Trial Court Adjudication, 10/11/2019, Finding of Fact No. 9; R.R. 3056a.  In actuality, Hlubb opined that the fair market value was $42.6 million for 2017 and 2018 and $44.5 million for tax year 2019.  Inaccuracies aside, the trial court did not explain how Hlubb's testimony could be accepted but not used, or why it chose to use $74 million for all three tax years.  Likewise, the trial court mis-stated Coyle's opinion for 2019; it was $73 million, not $74 million.

To set his fair market value of the Medical Center and Seminary properties, Coyle blended elements of reproduction cost and replacement cost methodology.  Hlubb used replacement cost in his cost evaluation, which is authorized by the Appraisal Institute.  By contrast, Coyle cited the International Association of Assessing Officers, but Coyle is not an assessor.  The disciplines of assessor and appraiser are different.  The trial court did not consider, and resolve, the differences in the cost approaches used by each expert, including the different methods used to depreciate the cost valuations.

The School District contends that because the trial court did not depart from Coyle's opinion of value, no additional explanation is required.  In support, it cites *Westinghouse Electric Corporation*, 652 A.2d 1306.  In that assessment appeal, the trial court found all the expert testimony competent.  In the end, however, the trial court made its own finding of fair market value, essentially "split[ting] the difference" between the two experts' opinions of value.  *Id.* at 1311.  The Supreme Court affirmed, explaining that where a trial court is presented with conflicting testimony of equally credible experts, it may choose a fair market value between the two values.  *Id.* at 1312.  *Westinghouse Electric Corporation* is inapposite.  Here,

the trial court did not reject both experts' valuations of the property; rather, the trial court accepted both.

Further, the School District overlooks this Court's precedent that, although a trial court may deem one expert more credible than the other, it must explain that decision. *See Grand Prix Harrisburg*, 51 A.3d at 282. In *Grand Prix Harrisburg*, the taxpayer challenged the 2009 real estate assessment of its property, which was a hotel. The taxpayer's expert prepared an appraisal report of the property's fair market value using the sales comparison approach and the income approach. By combining the two approaches, the taxpayer's expert settled on a fair market value of $9 million for the property. The taxing authorities' expert determined that the property had a value of $13,150,000 using the income approach and a value of $12,322,000 using the sales comparison approach. The trial court held that the property's fair market value was $13,150,000, crediting the taxing authorities' expert that a buyer would rely on the income of a property when purchasing a hotel.

On appeal, the taxpayer challenged the trial court's stated reasons for its determination. The critical difference between the two experts was the capitalization rate that each chose to produce an income valuation, which difference the court did not address. Likewise, the trial court did not address the difference in the experts' sales comparison approach valuations or the admission by the taxing authorities' expert that the income approach value was too high. Concluding that the trial court needed to address these issues, we vacated the order and remanded the matter.

Here, the trial court accepted the testimony of both experts, even though each expert used different methods and sources to develop their expert valuations.

32

The trial court did not address Coyle's blending of the reproduction cost and replacement cost methodologies or Taxpayer's challenge thereto.

The trial court did not explain the basis of its fair market value of $74 million or how it resolved the conflict between the expert opinions and methodologies. This will be required in the adjudication issued upon remand. Effective judicial review of an assessment requires a clear statement of "the basis and reasons for [the court's] decision." *Westinghouse Electric Corporation*, 652 A.2d at 1312. Accordingly, the trial court, by a newly assigned judge, must provide an explanation for whatever valuation it sets for the 57.7-acre property that is the subject of this tax assessment appeal.[23]

## Conclusion

Senior Judge Braxton vacated his position as senior judge by operation of law on June 16, 2019, when he began to receive compensation for his incompatible service on the Philadelphia Tax Board, which was a "position of profit in the government of the United States, the Commonwealth or any municipal corporation or political subdivision thereof." PA. CONST. art. V, §17(a). The 34 orders issued on Taxpayer's tax appeals are null and void. We grant Taxpayer's application to vacate the trial court's orders. This requires a remand of these matters for a decision by a newly assigned jurist that will state "the basis and reasons for [the court's] decision." *Westinghouse Electric Corporation*, 652 A.2d at 1312. The trial

---

[23] We do not address Taxpayer's challenge to the use of the Integra Realty report. It may or may not be relevant to the new valuation on remand.

33

court, on remand, may supplement the record if deemed appropriate but may not supplant the existing record.

_____
MARY HANNAH LEAVITT, President Judge Emerita

Judge Fizzano Cannon did not participate in the decision in this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of Prospect Crozer LLC :
from the Decision of the Board of :
Assessment Appeals of Delaware :
County, PA : Nos. 1596 – 1599 C.D. 2019
: Nos. 1600 – 1629 C.D. 2019
Appeal of: Prospect Crozer LLC :

**ORDER**

AND NOW this 28th day of September, 2022, Prospect Crozer LLC's Application to Vacate Orders on Appeal Because of Structural Error is GRANTED, and the orders of the Court of Common Pleas of Delaware County, dated October 11, 2019, are VACATED. This case is REMANDED for a new decision in accordance with the foregoing opinion.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, President Judge Emerita